## APPEAL OF ATLANTIC CARTON CORPORATION.

Docket No. 188.    Submitted January 2, 1925.    Decided July 15, 1925.

1. Taxpayer sought to take as a deduction from gross income a loss claimed to be due to the exhaustion of a valuable contract at the alleged expiration date thereof. *Held:* (a) That the contract in question constituted a capital asset which must be exhausted over the life thereof and deduction for such exhaustion prorated accordingly; (b) that the cost of the contract to the taxpayer was not established and hence no basis appears for computing such deduction.

2. Taxpayer issued $1,000 of its preferred stock to one Simpson, who assisted promoter of taxpayer in securing a contract. Thereafter, taxpayer repurchased this stock from Simpson at par for $1,000 and claims a deduction therefor as a loss. *Held,* that the purchase by a corporation of shares of its capital stock does not result in a realized loss.

*Robert H. Koehler, Esq.,* for the taxpayer.
*John D. Foley, Esq.,* and *A. R. Marrs, Esq.,* for the Commissioner.

Before IVINS, KORNER, and MARQUETTE.

This appeal is from a determination by the Commissioner of a deficiency in income and profits taxes for the years 1918 and 1919. The entire amount of the deficiency is not in controversy but only so much thereof as arises from the disallowance of a deduction of $22,000, taken by taxpayer in computing its net income for the year 1919. A hearing was held and the appeal submitted on the pleadings, and oral and documentary evidence, from which the Board makes the following

### FINDINGS OF FACT.

1. The taxpayer is a corporation organized under the laws of the State of New York. Its principal office is at No. 64 Wall Street, City of New York, but its business and manufacturing offices are at Norwich, Conn.

2. The circumstances leading up to and surrounding the organization of the corporation were as follows:

Some time in the year 1916, Walter E. Turner, who was familiar with the manufacture of paper boxes and cartons, conceived the idea of organizing a corporation to engage in that business. To that end he associated himself with one Albert M. Van Wagenen. Turner then obtained an oral contract from the Loose-Wiles Biscuit Co. to supply it with a large number of finished biscuit cartons. Turner also entered into negotiations with Henry Mueller, treasurer of the C. L. Mueller Co. of Jersey City, N. J., as the result of which Mueller agreed orally to advance Turner $10,000 and to give him a contract to furnish the C. F. Mueller Co. twenty million cartons.

At the same time Mueller agreed that in the event Turner proved his ability to fully execute the first order of cartons, he (Mueller) would advance an additional $15,000 and place a further order for cartons in a large amount. Turner and Van Wagenen, upon the strength of the oral contracts or agreements made with the Loose-Wiles Biscuit Co. and the C. F. Mueller Co., obtained an oral agreement from the Federal Paper Board Co. of Versailles, Conn., to furnish them on credit, and at a price $5.00 per ton under the market, sufficient quantities of paper board to enable them to fill the orders from the Loose-Wiles Biscuit Co. and the C. F. Mueller Co. They also obtained an option to purchase for $15,000 a piece of property in Norwich, Conn., suitable for a carton factory, arranged to borrow $12,000 thereon, and found a manufacturer of machinery who agreed to supply them, partly on credit, with the machinery necessary to equip the factory on which they had the option.

3. About the time of the verbal agreements just referred to, or very soon thereafter, Turner and Van Wagenen organized the Atlantic Carton Corporation. The date of its organization was November 24, 1916. On November 23, 1916, Turner and Van Wagenen made the following written proposal to the Atlantic Carton Corporation:

We, the undersigned, Walter E. Turner and Albert M. Van Wagenen, for many years have been engaged in the business of manufacturing cartons of all kinds, and the undersigned, Walter E. Turner, has had extensive experience for upwards of six years in the sale of such cartons, and is thoroughly acquainted with the trade, having visited and sold extensively to such trade. We presented to certain of our customers a proposition to manufacture cartons at a price which shall save to them ten percent of the price which they are now paying for similar goods, which proposition has been accepted by two very large users of such cartons, to wit, the C. F. Mueller Company, manufacturers of macaroni at Jersey City, and Loose-Wiles of Boston. We carefully estimated the amount of goods ordered by these two corporations, based upon their purchases in the past several years and upon our conversations and dealings with them in connection with this proposition, and conservatively estimated such purchases at not less than Two hundred and fifty thousand ($250,000) dollars per annum. We have likewise carefully computed in great detail the manufacturing cost of such goods and estimate the net profits on such sales at ten (10) percent of the amount of such sales. These computations are submitted to you herewith and we believe them to be true and accurate estimates.

The condition of the paper market is precarious at the present time, due to the war conditions. Prices have advanced as much as three hundred (300) per cent, with further advances in sight. Manufacturers are generally refusing advance commitments for even the usual yearly periods, and in our opinion, fortified by the opinion of others in the trade, this condition is most likely to continue for eighteen months to two years, even though the war should shortly cease.

Notwithstanding these unusual conditions we have been fortunate in procuring an agreement from the Federal Paper Board Company of Versailles, Connecticut, to supply us with so much cardboard as we shall require, based

upon the aforesaid estimates, and to extend to us three to four months credit therefor. We estimate the purchases will amount to approximately Four thousand ($4,000) Dollars per week. We shall agree that the terms of this agreement shall enure to the benefit of your corporation upon acceptance of our offer as hereinafter mentioned.

We have certain persons who are prepared to supply us with Fourteen Thousand ($14,000) Dollars cash to be used as capital in the furtherance of such business, a machinery manufacturer who will furnish us with the necessary machines, partly on credit, and an option for the purchase of a certain piece of property situated on South Golden Street in the City of Norwich, Connecticut, to be used as a factory for the manufacture of such cartons, for Sixteen Thousand ($16,000) Dollars upon which, we have already arranged to obtain a first mortgage of Eight thousand ($8,000) Dollars from a local Savings Bank and a second mortgage of Four Thousand ($4,000) Dollars.

We hereby offer to assign to your corporation aforesaid the accounts of C. F. Mueller Company and of Loose Wiles Company, and agree to procure from said C. F. Mueller Company a contract with your corporation for the purchase of a minimum of twenty million cartons during the year 1917. The Mueller Company have advised us that they will use between twenty and twenty-five million cartons during the year; and to assign our said agreement with the Federal Paper Board Company, which we agree shall enure to the benefit of your corporation upon acceptance of our offer as herein contained, and to sell and assign our option to purchase said property situated in Norwich, Connecticut, upon the terms mentioned in said option, and hereinbefore specified.

We also agree that the persons who have agreed to supply us with capital for the purpose above mentioned, will sign subscription agreements for your preferred capital stock for a sum not exceeding Fourteen thousand ($14,000) Dollars, which shall be subscribed and paid in within thirty days after the date of your acceptance of this agreement.

We also agree to assign all our rights in the proposition of the machinery manufacturer to you so that the same will enure to the benefit of your corporation.

In consideration of the foregoing, your corporation shall issue to us One hundred and sixty shares of the preferred stock of your corporation of the par value of One hundred ($100) Dollars each, aggregating sixteen thousand ($16,000) dollars, and one thousand shares of the common stock of said corporation, which has no par or nominal value, which shall include the three shares of common stock subscribed by the incorporators and which shall be assigned to us and issued as fully paid stock (it being taken and considered as part of the one thousand shares so to be issued to us in payment for such property).

We hereby agree to donate to the treasury of your corporation the one hundred and sixty shares of the preferred capital stock of the par value of One hundred ($100) Dollars each, aggregating Sixteen thousand ($16,000) Dollars to be disposed of by the directors thereof upon such terms and conditions and in such manner as they may by resolution hereafter direct.

We also offer to your corporation our services in the general management and direction of its affairs and agree to devote our entire time and attention to your interests and affairs and to develop and manage your business to the best of our ability, at a salary of Twenty-six hundred ($2,600) Dollars per annum to Mr. Turner and Twenty-six hundred ($2,600) Dollars per annum to Mr. Van Wagenen. No part of the stock issued pursuant to this offer shall.

however, be deemed to have been issued for such contract or services or any part thereof. The salaries mentioned are very low, compared with our earnings in the past several years. Mr. Van Wagenen is now satisfactorily employed at a considerably higher salary. Our faith in your future under the plan outlined induces us to make this offer.

This offer upon its acceptance by you shall be deemed to be an assignment of all our rights under, in and to the matters herein mentioned and we shall, if requested, execute such other or further assignments or other instruments as may be required to carry this proposition into full force and effect.

On November 24, 1916, the proposal made by Turner and Van Wagenen was accepted by the corporation by the following resolution:

Resolved that the said offer be, and the same hereby is, accepted by this corporation, and that this corporation purchase the aforesaid property from Walter E. Turner and Albert M. Van Wagenen upon the terms and conditions and for the consideration mentioned in said offer, and it was

Further resolved that in the judgment of this Board of Directors, the value of the property so sold to and purchased by this corporation, as hereinbefore set forth, is reasonably worth the sum of Twenty-one thousand ($21,000) dollars, and that this corporation do issue to Walter E. Turner and Albert M. Van Wagenen one hundred and sixty shares of its preferred capital stock of the par value of one hundred ($100) dollars each, aggregating sixteen thousand ($16,000) dollars, and one thousand shares of its common capital stock, authorized to be issued without par value in full payment of the property mentioned and described in said offer.

4. On December 16, 1916, the Atlantic Carton Corporation and the Loose-Wiles Biscuit Co. entered into a contract, the pertinent portions of which were as follows:

Confirming correspondence and personal interview with Mr. W. E. Turner, President of this Corporation, we herein propose and agree to sell you, for delivery as wanted and in such quantities as you may hereinafter determine and designate, and as hereinafter specified, a minimum of fifteen (15) carloads, or at your option, a maximum of twenty five (25) carloads of finished Biscuit Cartons—a car to be considered a minimum of 40,000 lbs., but cars of greater tonnage may be specified, if your requirements necessitate. Said sale and purchase to be subject to the following specifications and terms:

\*          \*          \*          \*          \*          \*          \*

The time which this contract is to run is for a period of s.x months from the date of shipment of first car hereunder, it being contemplated and agreed that the first car will be shipped not later than the month of February, although if shipment is delayed through our inability, then it is understood that the contract will run for a six months' period from the date of such first shipment.

\*          \*          \*          \*          \*          \*          \*

This proposal is submitted in quadruplicate, signed by authorized official of this corporation, and when accepted by you in writing, shall become a firm and bind.ng contract on the part of both, and shall inure and be binding upon their respective successors, administrators and assigns.

Yours very truly,                    ATLANTIC CARTON CORPORATION,
Accepted:                            WALTER E. TURNER, President.
  LOOSE-WILES BISCUIT CO.,
  JOHN H. WILES, Vice-Pres.

5. On December 11, 1916, the C. F. Mueller Co., as party of the first part, Walter E. Turner and Albert M. Van Wagenen, as parties of the second part, and the Atlantic Carton Corporation, as party of the third part, entered into the following written contract:

For and in consideration of the sum of One ($1.00) dollar, lawful money of the United States, in hand paid by each .of the parties to the other, the receipt whereof is hereby acknowledged, and of the mutual covenants and conditions herein contained, the parties do agree as follows:

First. The party of the first part agrees to purchase from the parties of the second part, one hundred (100) shares of the preferred capital stock of the par value of One Hundred ($100) Dollars each of the Atlantic Carton Corporation, and agrees to pay therefor the sum of Ten Thousand ($10,000) Dollars, by executing and delivering to the parties of the second part, or their nominee or nominees, a negotiable note for the sum of ten thousand, ($10,000) dollars, payable four months after its date, which note is to be executed and delivered upon the execution of this agreement, and the certificate for said stock is to be delivered upon its issuance to the party of the first part by the Atlantic Carton Corporation. The parties of the second part agree to pay in cash the sum of ten thousand ($10,000) dollars to the Atlantic Carton Corporation in full payment of the aforesaid stock.

Second. The party of the first part agrees to deposit the aforesaid stock as collateral security for the payment of said note, and any renewals thereof, with the parties of the second part, or such other owner or holder of said note, under such terms of collateral note as any bank or Trust Company may require in the usual course of business.

Third. The party of the first part agrees to purchase from the party of the third part who agrees to manufacture and sell to the party of the first part during the twelve months, dating from the time of the first delivery of the cartons hereinafter mentioned, to wit: not less than twenty million (20,000,000) cartons, which shall be equal in kind, quality and workmanship to the cartons, which the party of the first part now has, and with which it has heretofore been supplied during the year 1916. Such cartons shall be delivered in such quantities and at such times during said year as the party of the first part shall by written order designate. The party of the first part shall. immediately order the delivery of seven million (7,000,000) cartons hereunder, deliveries upon which shall begin not later than April 1st, 1917.

Fourth. The net price of such cartons shall be equal to a sum which shall be ten per cent (10%) less than the result computed upon the following basis:

The cardboard used for the manufacture of said cartons shall be computed at $59.50 per ton; the cutting and creasing presses shall be computed at $1.00 per hour; the silicating and paraffining machine shall be computed at $1.25 per hour, and the overhead expense for the manufacture and production of said cardboard, including all executive expense, shall be computed at forty-five and one-half per centum of the total manufacturing cost, plus a handling charge of twenty-four (.24¢) cents per hundred weight. The bills shall be rendered upon the full amount of the above estimate of cost (excluding the ten per cent (10%) discount). The party of the first part agrees to pay on or before the 10th day of the succeeding calendar month, for all goods so delivered to it in the preceding month.

Fifth. Upon the payment of the bills or invoices and until the payment of the note aforesaid for Ten Thousand ($10,000) Dollars, or renewals thereof, the party of the third part agrees to deposit in such bank or banks as may

be agreed upon, to the joint account of the parties of the first and third parts, ten percentum (10%) of the face amount of such bills or invoices, exclusive of freight charges or other disbursements. The party of the third part is hereby authorized to withdraw such moneys at the maturity of the said note, or any renewal or renewals, thereof, and shall apply such moneys to the payment or reduction of the said note for Ten Thousand ($10,000) Dollars, or any balance thereof when due, or to any renewal or renewals thereof.

In the event that the party of the first part shall pay the whole amount of said note, or any renewals thereof, upon any maturity, the balance of the funds so deposited in said joint account shall forthwith be payable to the party hereto of the first part.

Sixth. The parties hereto do mutually covenant and agree that nothing in this agreement shall in any manner be deemed as an offset or a defense to said note, or any renewal or renewals thereof, in the hands of a bona fide purchaser, nor shall the parties hereto be required to disclose the terms and conditions of this agreement, but the said note may be discounted as a negotiable instrument without reference hereto.

Seventh. The parties of the second part agree to procure a renewal of the balance due upon said note at its maturity, and to procure subsequent renewals thereof until the full amount of said note shall have been paid out of the ten percent (10%) fund as provided in Article Fifth, and do further agree to save and hold the party of the first part harmless from any demand for the payment of the said note, or any balance thereof at any of the respective maturities thereof.

Eighth. In the event that the party of the first part shall not order a sufficient quantity of goods, so that ten percentum (10%) of the face of the bills shall not in the aggregate pay the said note of Ten Thousand ($10,000) Dollars, and the parties of the second part should thereby be required to pay the said note, or any part thereof, then in such event, the party of the first part agrees to assign, transfer and deliver to the parties of the second part such proportion of the said preferred capital stock of the Atlantic Carton Corporation, as the sum so paid bears to Ten Thousand ($10,000) Dollars, computed at the then book value, but in no event greater than the par value thereof. If upon computation thereof, it shall be found that the sum so paid is not a multiple of One Hundred (100) Dollars, and the remainder is a sum less than One Hundred (100) Dollars, the parties of the second part shall have the right and option to pay such amount as will produce a multiple of One Hundred ($100) Dollars to the party of the first part, who shall thereupon transfer an additional share of said stock to the said parties of the second part. Provided, however, that the parties of the second part shall hold the said certificate or certificates of stock until they shall be reimbursed out of the ten (10%) percent fund or otherwise for such amount or amounts as they shall have been required to pay under the terms of this agreement, whereupon the said certificate of stock shall be redelivered to the party of the first part; and further provided, however, that the said note shall not be paid by the parties of the second part as a result of any default of the party of the first part. In the event that the stock shall be held as collateral to the said note the parties of the second part shall be entitled to such certificates of stock, subject only to the lien or claim of the said collateral holder.

Ninth. It is further agreed between the parties of the first and third parts hereto that the holders of the preferred stock of the party of the third part, issued and outstanding, shall be entitled to the same vote as the holders of the common stock upon any proposition, to issue any stock which shall in any

92208—26——25

manner have the preference as to lien or payment, prior to the present preferred stock of the party of the third part, and that a by-law of the party of the third part will be passed upon its organization, and before the execution and delivery of this agreement, which shall so provide, and that such by-law shall not be amended or repealed unless by the majority vote of the holders of the preferred stock issued and outstanding.

In witness whereof, the parties of the first and third parts have caused this agreement to be signed by their respective proper officers, and their respective corporate seals to be hereunto affixed, and the parties of the second part have hereunto set their hands and seals the day and year first above written.

C. F. MUELLER COMPANY,<br>By C. F. MUELLER, <em>Pres.</em>

Attest:

HENRY MUELLER, <em>Secy.</em>          WALTER E. TURNER.   (L. S.)

Attest:

ALBERT M. VAN WAGENEN.          ALBERT M. VAN WAGENEN.   (L. S.)

ATLANTIC CARTON CORPORATION,<br>By WALTER E. TURNER, <em>Pres.</em>

6. Early in the year 1918 Turner, as president of the Atlantic Carton Corporation, approached Henry Mueller and explained that he needed the additional $15,000 which Mueller had agreed to put into the business Turner had organized. Shortly thereafter, to wit, on March 14, 1918, the C. F. Mueller Co., Turner and Van Wagenen, and the Atlantic Carton Corporation entered into a second written contract. This contract was practically identical with the contract of December 11, 1916, except that the C. F. Mueller Co. agreed to purchase 150 shares of the preferred stock of the Atlantic Carton Corporation from Turner and Van Wagenen and to give them a promissory note for $15,000 in payment for the stock and to purchase from the Atlantic Carton Corporation not less than 40,000,-000 cartons as follows:

Third. The party of the first part agrees to purchase from the party of the third part who agrees to manufacture and sell to the party of the first part during the twenty-four months, dating from the time of the first delivery of the cartons hereinafter mentioned, to wit: not less than forty million (40,-000,000) Cartons, which shall be equal in kind, quality, and workmanship to the Cartons, which the party of the first part now has and with which it has heretofore been supplied during the year 1917. Such cartons shall be delivered in such quantities and at such times during said twenty-four months as the party of the first part shall by written order designate, at the rate of twenty million, (20,000,000) cartons each twelve months. The party of the first part shall immediately order the delivery of seven million (7,000,000) cartons hereunder, deliveries of which shall begin within one week from date of completion of contract entered into, agreed by and signed by the three parties of this contract under date of December 11th, 1916.

7. The several contracts hereinabove set forth were fully performed according to the tenor thereof. The contract with the Loose-Wiles Biscuit Co. was completed in the year 1917; the first contract

with the C. F. Mueller Co. was completed in 1918; and the second contract with C. F. Mueller Co. in 1919.

8. The taxpayer issued to one Robert Simpson, an employee of the C. F. Mueller Co., $1,000 of preferred stock for assistance voluntarily rendered by him in making it possible for Walter E. Turner to get in touch with C. F. Mueller and thereby to secure the contracts set forth. The taxpayer repurchased the stock from Simpson in the year 1919 at par.

9. In its income-tax return for the year 1919, the taxpayer deducted from gross income $22,000, under Schedule A–23, which it claimed represented the cost of the contracts purchased from Turner and Van Wagenen and which it alleged expired in that year, together with the cost of the stock repurchased from Simpson. In its income-tax return the taxpayer stated in Schedule A–23:

This item covers contracts, options, etc., which were purchased by the Atlantic Carton Corporation from Messrs. Walter Turner and Albert M. Van Wagenen at the commencement of business, October 31, 1916, for the consideration of $22,000, being $17,000 preferred stock and $5,000 common stock. The contracts were very favorable ones from customers for our goods, consisting of paper board used in the manufacture of our products at prices which were considerably under the market at that time. These contracts and options ceased to be of any value at the close of 1917, at which time the above amount of principal would have been written off if our surplus had been large enough to do so.

Likewise at the close of business in 1918, we did not have sufficient surplus to offset this item, consequently we carried it as an asset under the caption "contracts and options."

The Commissioner disallowed the deduction and determined that there is a deficiency in tax in the amount of $9,559.53 for the years 1918 and 1919. The taxpayer was notified of the Commissioner's determination by registered letter mailed July 23, 1924. The petition herein was filed September 15, 1925.

## DECISION.

The determination of the Commissioner is approved.

## OPINION.

KORNER, Chairman: This appeal involves the deductibility of an alleged loss of a capital asset. The taxpayer contends it had a valuable contract which was terminated in the year 1919, and that, by reason of such termination, the contract became valueless and gave rise to a loss in that year. The taxpayer also contends that because it repurchased at par, in the year 1919, $1,000 of its preferred stock, which had been issued to one Simpson for assistance he had voluntarily rendered Turner in securing the contract mentioned, a further deductible loss of $1,000 was sustained. The total

alleged loss, if any, is therefore in the nature of an exhaustion of capital assets.

There is a conflict between the parties both as to the nature of the contract involved and as to its value. The taxpayer contends that, by the contract of November 23, 1916, it acquired from Turner and Van Wagenen, for $21,000 in stock, certain contracts and options which they had theretofore secured; that the second contract given the taxpayer in 1918, by the C. F. Mueller Co. was a part of and was made pursuant to the oral agreement entered into by and between Turner and Mueller in the fall of 1916, and was included in the contracts assigned to the taxpayer by Turner and Van Wagenen, and that, as the second contract with Mueller expired in 1919, the other contracts and options having expired or been exercised prior to that year, the assets acquired by the taxpayer under the contract of November 23, 1916, became exhausted in 1919, and that the cost thereof then became deductible. The Commissioner contends that the contracts with the C. F. Mueller Co. were in fact nothing more than subscriptions by that company to the capital stock of the taxpayer, and did not represent an asset to the taxpayer; that the evidence fails to establish that the taxpayer paid $21,000 for whatever it may have acquired under the contract of November 23, 1916; and that whatever it did acquire is either still used in the business or was exhausted prior to 1919.

Taking the most favorable view of the situation for the taxpayer, the contracts and options turned over to the corporation by Turner and Van Wagenen under the contract of November 23, 1916, were property and their cost was properly capital of the corporation. Therefore, the taxpayer was entitled to take deductions for the exhaustion of that property in the same manner as in the case of any other exhaustible property; that is, to spread such exhaustion over the life of the property and deduct an aliquot part in each year of its life. *Appeal of Grosvenor Atterbury*, 1 B. T. A. 169; *Philip Henrici Co.* v. *Reinecke*, 3 Fed. (2d) 34.

The Revenue Act of 1918 does not give a taxpayer the right to elect whether to take deductions in the years in which the facts justifying them occur, or to waive them and make later returns as if such facts had not occurred. The exhaustion for which deductions were not properly taken in the years in which it actually occurred may not be cumulated or lumped and taken in a later year when exhaustion is complete. *Appeal of Even Realty Co.*, 1 B. T. A. 355; *Appeal of Fort Orange Paper Co.*, 1 B. T. A. 1230. The Commissioner should, therefore, if not barred by the statute of limitations, recompute the taxes for each year on the basis of the real facts, even though the taxpayer may have previously ignored these facts to its detriment. *Appeal of Even Realty Co., supra.*

In view of what we have said above, there remains for consideration only the value, if any, of the capital assets involved herein. This presents a more difficult question. The contract of November 23, 1916, provided that there should be issued to Turner and Van Wagenen for their contracts and options 160 shares of preferred stock of the par value of $100 each and 1,000 shares of common stock of no par value, but on which a value of $5 per share has been placed by the taxpayer. The evidence in this case discloses, however, that the preferred stock in question was not in fact issued to Turner and Van Wagenen, but that Turner discounted the promissory note of Henry Mueller, and with the proceeds thereof paid for the preferred stock *in cash* to the extent of $10,000 and that $4,000 in cash was paid in for preferred stock by others, making $14,000 preferred stock, of a total of $16,000 authorized, issued for cash by the corporation. At the same time Turner had the $10,000 of preferred stock (paid for by him with the proceeds of the Mueller note) issued to Mueller as collateral security for the performance of the taxpayer's contract to furnish cartons to the Mueller Co.

The several contracts and options secured by Turner and Van Wagenen prior to the formation of the corporation, namely, the Mueller Co. and Loose-Wiles Co. contracts, the Federal Paper Co. contract, and the option to purchase the factory, machinery, etc., are so closely entwined and wrapped up together as to become entirely interdependent in contributing to the success of the new corporation about to be launched. For this purpose each was useless without the other. The elements of value are not separable. The failure of one would have been the failure of all. The Mueller and Loose-Wiles contracts were of no value to the taxpayer, unless it could secure the raw material, machinery, and a plant to manufacture the cartons. On the other hand, there is nothing to show that the options to purchase the plant, machinery, and raw materails had any value to this taxpayer without contracts for the manufactured product. Hence, if there was any value in the various contracts and options it was because of the ability of Turner to synchronize and bring them together to form a whole. The real element of value was the business acumen, industry, and ingenuity of Turner, and without that acumen, industry, and ingenuity there would have been no value to the corporation in the contracts and options acquired under the contract of March 23, 1916. The Mueller contracts called for the sale by the taxpayer of cartons at market price less 10 per cent, which 10 per cent was to be applied to the payment of Mueller's note for stock. The corporation still has its plant and machinery, which were component parts of the value, if any, attributable to the agreement of November 23, 1916. No value has been established, or sought to be established, by the tax-

payer for the plant and machinery or for the Loose-Wiles contract on the options to purchase raw material, which were likewise a component part of the asset transferred to the corporation by Turner and Van Wagenen. Furthermore, it is not apparent from the record that the contracts and options involved were turned in to the corporation by Turner and Van Wagenen for any stock except the common stock, for, as shown above, the preferred stock was paid for with cash and not with contracts.

As we have shown above, the record fails to disclose that the taxpayer paid to Turner and Van Wagenen for the contracts and options under consideration anything except 1,000 shares of the common stock. A value of $5,000 has been claimed therefor, but that value has not been established.

The taxpayer has, in our opinion, failed to show what of value, if anything, it paid for the contracts and options in question, and it therefore follows that it is not entitled to any deductions from gross income as allowances for the exhaustion thereof.

With reference to the stock repurchased from Simpson, we have held in the *Appeal of Simmons & Hammond Mfg. Co.*, 1 B. T. A. 803, that the purchase by a taxpayer corporation of shares of its capital stock does not result in a realized loss. The taxpayer is therefore not entitled to deduct from gross income the purchase price of the stock in question.